677 So.2d 458 (1996)
STATE of Louisiana, Plaintiff-Appellee,
v.
Bobby Allen SMITH, Defendant-Appellant.
No. CR95-1171.
Court of Appeal of Louisiana, Third Circuit.
April 24, 1996.
*459 Robert Richard Bryant, Jr., V. Ed McGuire, III, Lake Charles, for State of Louisiana.
*460 Eugene Bouquet, for Bobby Smith.
Before THIBODEAUX, SAUNDERS and AMY, JJ.
THIBODEAUX, Judge.
The defendant, Bobby Allen Smith, appeals his conviction and mandatory life sentence for the crime of second degree murder. He argues that the law and evidence were insufficient to convict him and his video confession was involuntary and unknowingly made because of his low mental state.
We disagree and affirm.

INSUFFICIENCY OF THE LAW AND EVIDENCE CLAIMS
The defendant claims the law and evidence were insufficient to convict him of second degree murder. When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State v. Duncan, 420 So.2d 1105 (La.1982).
In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. Defendant was convicted of second degree murder, a violation of La.R.S. 14:30.1 which states:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm;
Defendant argues that specific intent did not exist because of his mental condition and because he was intoxicated. Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). In State v. Bell, 543 So.2d 1013 (La.App. 3 Cir.1989), this court explained:
Louisiana does not recognize the doctrine of diminished capacity. Therefore, a mental defect or disorder short of legal insanity cannot serve to negate specific intent and thus reduce the degree of a crime. Evidence of a defendant's mental capacity at a trial where insanity is raised as a defense is presented for use in determining whether the defendant was legally insane at the time the offense was committed. It is not relevant to determining the issue of specific intent. State v. Jones, 359 So.2d 95 (La.1978), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708 (1978); State v. Pravata, 522 So.2d 606 (La.App. 1st Cir.1988), writ denied, 531 So.2d 261 (La.1988).
Bell, 543 So.2d at 1019.
Louisiana Revised Statute 14:14 states:
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
The law requires that defendant, in order to avail himself of the insanity defense, must plead not guilty and not guilty by reason of insanity and must show that he was unable to distinguish right from wrong. State v. Brown, 550 So.2d 922 (La.App. 2 Cir.1989), writ denied, 556 So.2d 1259 (La. 1990). The defendant did so. In State v. Knowles, 598 So.2d 430 (La.App. 2 Cir.1992), the court explained:
In Louisiana there is a legal presumption that the defendant is sane and responsible for his actions. A defendant who wishes to negate this presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. LSA-C.Cr.P. Art. 652.
The question of whether or not a defendant has affirmatively proved his insanity and should not be held responsible for his actions is one for the jury. State v. Marmillion, 339 So.2d 788 (La.1976); State v. Pravata, supra. When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable *461 doubt, the standard for review by an appellate court is whether or not any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Claibon, 395 So.2d 770 (La.1981).
Knowles, 598 So.2d at 435.
The defendant alleges he lacked specific intent not only because of his mental condition but also because he was intoxicated. Louisiana Revised Statute 14:15 states:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
* * * * * *
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
The burden is upon the defendant to prove the existence of such a state of intoxication at the time of the offense. State v. Tezeno, 507 So.2d 291 (La.App. 3 Cir.1987). Specific intent is a legal conclusion which the trier of fact ultimately resolves. State v. Graham, 420 So.2d 1126 (La.1982). Finally, in State v. McKeever, 407 So.2d 662 (La. 1981), the Louisiana Supreme Court held that where the jury has heard all the evidence and received the proper instructions from the trial judge regarding an intoxication defense, its verdict should not be impinged upon absent an abuse of the jury's discretion. State v. Salas Martinez, 524 So.2d 871, 874 (La.App. 3 Cir.1988), writ denied, 525 So.2d 1047 (La.1988).
The trial testimony and video taped confession provided sufficient evidence for a rational trier of fact to have found the defendant did not prove by a preponderance of the evidence that he was insane at the time of the offense. Also, sufficient evidence existed for a rational trier of fact to have found all the essential elements of the crime of second degree murder, including specific intent, proven beyond a reasonable doubt.
The state called Lake Charles Police Detective Ramby Cormier, who testified he was the lead officer in the investigation of this case. He said he received Smith's name from a written statement, and he proceeded with two other officers to Smith's residence. They identified themselves as police officers, told Smith of the investigation, and he agreed to go with them to the Calcasieu Parish Sheriff's department substation in Sulphur. Smith signed a waiver of rights form before he revealed what had happened. He told the officers of the events that transpired and gave them the names of the others involved. At the request of the officers, Smith showed them the locations of the beatings and killing. They returned to the Violent Crimes Task Force office in Lake Charles where defendant again executed a waiver of rights form prior to giving his videotaped statement.
Calcasieu Parish Sheriff's Detective Donald Delouche testified to essentially the same facts as Cormier.
Defense witness Alissa Jean stated she had lived next door to the defendant for four years. Alissa Jean is the wife of Norman Jean, who was involved in the murder. Alissa stated that during those four years, Bobby Smith visited her family every day. She further stated that her husband had beaten her up on two occasions and tried to kill her when she separated from him two weeks before he was arrested. She said her husband had also struck Larry Duhon, a minor who used to come to the house. Alissa Jean said the defendant was scared of her husband and that her husband was controlling. She said her husband would threaten and intimidate Smith.
Brenda Frey, mother of the defendant, stated Smith had a reading disability and read at a third grade level. She further stated he could be easily led into things. Frey said Smith would try to answer people the way he thought they wanted to be answered. On cross-examination Frey admitted she did not know why Smith at first lied to the officers who questioned him and then *462 admitted to the murder. On redirect, Frey said that in December of 1991, Smith had been committed to the state mental hospital in Alexandria, where he stayed for approximately six months. He was diagnosed as having a conduct disorder. On re-cross she admitted Smith's mental defect was a learning disability and that he knew the difference between right and wrong.
The bulk of the evidence establishing Smith's part in murdering Arceneaux was revealed in his video taped confession. Smith stated he, Norman Jean and Corey Carroll were at Holly Beach when the victim approached them and asked for a ride in exchange for beer. Smith said all four of them had been drinking. The four traveled in Jean's truck to Cameron where they bought beer. They proceeded toward Carlyss. During the drive, the victim kept turning up the volume on the radio. Jean would turn it down so they could talk and the victim would again raise the volume. As this scenario repeated itself, defendant, Jean and Carroll became angry with the victim. Smith admits they never asked him to stop. Carroll told Smith they were going to hit the victim for doing it. Smith said the victim was falling asleep and did not hear the conversation. The four stopped near Ellender Bridge. When the victim stepped out of the truck, he fell down; Smith and Carroll picked him up. Smith turned his back to urinate and when he finished he turned around, and someone had just hit the victim. Smith said he then hit the victim once and kicked him with great force two or three times in the face and once in the ribs. The victim started bleeding from his head. Smith said Jean hit the victim two or three times in the face. The victim was not threatening or hitting any of them, but was asking them why they were hitting him and pleading with them to stop. Smith said he does not know why he hit him.
After the three men beat the victim, Jean loaded him in the back of the truck. They continued to drive, and the victim began regaining consciousness and tried to open the tailgate. Smith said he was angry at the victim but was scared they might kill him. They stopped the truck and Carroll jumped out and hit the victim two or three times. He fell back down in the bed of the truck.
Smith said they continued to drive and that he did not know where they were going. He said he figured they would go home after they dropped the victim on the side of the road. They stopped at the boat dock of the Choupique Bayou Bridge. Jean opened the tailgate and threw the victim out of the truck. Smith was holding the victim up while Carroll hit the victim. Smith said the victim was still asking them to stop and wanted to know why they were hitting him. He said none of them responded but continued to hit the victim. Jean came over with a log and hit the victim in the head with the log. The victim fell out of Smith's hands to the ground. Smith said they hit the victim for ten or fifteen minutes. He said Carroll hit the victim seven or eight times with the log, twice in the head and the others elsewhere. Smith said he hit the victim with the log between his chest and stomach. Smith then kicked the victim in the head four or five times. At this point, the victim was bleeding and had stopped talking but was gurgling blood. Jean checked his pulse and said he was dead. Carroll made sure no cars were coming and they loaded the victim into the truck, drove up to the bridge and parked on the bridge. Smith and Jean grabbed the victim and stuffed two large rocks in his shirt. Jean and Smith then rolled the victim off the bridge. The victim hit the water, went under, then came back up and began to float. Shortly thereafter, he went under.
Carroll went to dispose of the log, and when he returned they left. Smith said Carroll had taken the victim's wallet. They drove toward Smith's house and stopped the truck on the side of a road. They threw the blankets and other blood covered items from the back of the truck into a canal. The three then went to a car wash and cleaned the truck and themselves, and drove to Jean's house. Smith said he then went home and went to sleep.
Smith said the victim was so drunk that he could not defend himself. He further confessed he thought they might be killing the victim but it did not stop him from hitting Arceneaux. He then said he knew it *463 would probably kill Arceneaux. Smith said Jean had threatened Smith that if he told anyone, he would be floating with the victim. Smith said all three of them were responsible for the killing.
Little evidence was presented by the defendant on his claim of insanity. Thus, a rational trier of fact could conclude that the defendant did not prove by a preponderance of the evidence that he was legally insane when he participated in the murder of Arceneaux. The trier of fact properly found the defendant failed to prove his affirmative defense of intoxication. Taking the evidence in the light most favorable to the prosecution, the jury properly found the essential elements of the crime proven beyond a reasonable doubt. This assignment of error lacks merit.

THE VIDEOTAPED CONFESSION
Smith contends the trial court erred in permitting into evidence the video confession of defendant because it was not voluntarily and knowingly made due to his slow mental ability. On the first day of trial, a hearing was held out of the presence of the jury, and a foundation was laid for admitting the video taped confession. The trial judge found the statements and video tape were freely and voluntarily given. Louisiana Revised Statute 15:451 provides:
Before what purposes [purports] to be a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
In State v. Ashworth, 554 So.2d 271 (La.App. 3 Cir.1989), writ denied, 561 So.2d 113 (1990), this court explained:
Before the State may introduce into evidence what purports to be a confession or statement of a defendant, it must first affirmatively show that it was freely and voluntarily given and was not made under the influence of fear, duress, menaces, threats, inducements, or promises. La. C.Cr.P. Art. 703(G); La.R.S. 15:451; State v. Benoit, 440 So.2d 129 (La.1983); State v. Golmon, 536 So.2d 481 (La.App. 1 Cir. 1988); State v. Toups, 499 So.2d 1149 (La. App. 5 Cir.1986), writ den., 501 So.2d 772 (La.1987). In addition, if the statement was made during custodial interrogation, the State must prove that the accused was advised of his Miranda rights and intelligently and voluntarily waived those rights. La. Const. Art. 1, Sec. 13 (1974); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Coleman, 395 So.2d 704 (La.1981); State v. Toups, supra.
We note that, to meet its burden, the State may rely on the presumption of sanity provided in La.R.S. 15:432. State v. Golmon, supra. Because of this presumption, the defendant has the burden of proving a mental defect which renders him unable to understand his rights and, therefore, incompetent to waive them. State v. Glover, 343 So.2d 118 (La.1976); State v. Golmon, supra. The State is not required to negate a defendant's mental abnormality, but it must prove beyond a reasonable doubt that the confession or statement a defendant gave was voluntary. The defendant must then prove the existence of a mental defect or disorder that prevented his confession or statement from being intelligently and voluntarily made. State v. Glover, supra; State v. Golmon, supra. However, the law is clear that when the issue on appeal is whether an accused's level of intellectual capacity precludes him from effectively understanding the essential nature of his right to remain silent, to have assistance of counsel, and of the consequences of his speech, much discretion is accorded to the trial court's determination. State v. Lefevre, 419 So.2d 862 (La.1982); State v. Coleman, supra; State v. Mire, 492 So.2d 180 (La.App. 3 Cir.1986), writ den., 496 So.2d 347 (La. 1986).
Ashworth, 554 So.2d at 274-275.
In this case, the record supports the trial judge's determination that defendant's inculpatory statement on the videotape was admissible. Ramby Cormier testified concerning the questioning of defendant and his confession. Cormier said he, Deputy Delouche, and Deputy Perry went to Smith's house at approximately 8:00 p.m. on June 25, 1994. They spoke with his mother and advised her they needed to speak with Smith.
*464 They then identified themselves to Smith, told him they needed to talk to him, and asked if he would come with them, to which he agreed. Cormier said Smith did not appear to be mentally defective in any way so that he would not understand what they were talking to him about. Cormier said Smith went freely and voluntarily to the substation. At the station, Smith explained he had difficulty reading and writing. Cormier asked Smith to read out each of the Miranda rights on the waiver of rights form. As Smith read each right, Cormier asked him if he understood and, if so, to put his initial next to the right. Smith signed the form, indicating he understood his rights. Cormier said Smith fully understood the rights and that he was waiving those rights by executing the form and giving a statement. Cormier said Smith was not suffering from any mental defect that might prevent him from understanding his rights, and he freely and voluntarily executed the form. Smith gave a summary of the events that transpired that night, then showed the detectives the different locations where the beatings occurred.
Smith and the detectives returned to the Violent Crimes Task Force and advised defendant they wanted to get a statement and videotape statement. The defendant was again advised of his rights, but in this instance Cormier read the rights out to Smith and he initialed that he understood them as well as signing that he waived them. They recorded a video statement and thereafter discovered the tape did not come out. Defendant spoke to his mother between the two video tapings. He then agreed to do another video statement, and was once again advised of his rights. Smith's confession was again videotaped. At the beginning of the videotape, Cormier went over the rights form with defendant and again asked him if he understood, to which he replied he did.
Deputy Delouche concurred with Cormier's testimony and said defendant understood the rights and executed the waiver form freely and voluntarily. Defendant produced no testimony or evidence to dispute the statements of the detectives that he fully understood the rights he waived. Defendant did not prove he had a mental defect which prevented his confession from being intelligently and voluntarily made. In his videotaped confession, defendant was able to recall the details of the events with much clarity. In State v. Hahn, 526 So.2d 260 (La.App. 2 Cir.), writ denied, 532 So.2d 150 (1988), the court stated:
A diminished mental or intellectual capacity likewise does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Benoit, 440 So.2d 129 (La.1983). "The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily give a statement." Benoit, supra, at 131.
Hahn, 526 So.2d at 264.
Based on the detectives' testimony and the lack of evidence to the contrary, defendant was able to understand his rights and voluntarily give a statement. The trial judge correctly admitted the videotaped statements and this assignment of error lacks merit.

ERROR PATENT
Louisiana Code of Criminal Procedure Article 920 provides the scope of review on appeal, as follows:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence.
Louisiana Code of Criminal Procedure Article 880 provides that when imposing sentence, the court shall give the defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. The record indicates the trial court did not do so. Thus, the defendant's sentence is amended to reflect that the defendant is given credit for time served prior to the execution of the sentence. See La.Code Crim.P. art. 882(A). Resentencing is not required; however, this case is remanded to the district court to amend the commitment and minute entry of the sentence *465 to reflect that the defendant is given credit for time served. State v. Moore, 93-1632 (La.App. 3 Cir. 5/4/94), 640 So.2d 561.
Louisiana Code of Criminal Procedure Article 930.8 provides that at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief. The record shows the court did not so inform the defendant. The district court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.1993).

CONCLUSION
Viewing the evidence in the light most favorable to the prosecution, the jury properly found the essential elements of the crime, including specific intent, proven beyond a reasonable doubt. The defendant intelligently and voluntarily waived his rights and his statement was properly admitted into evidence. The defendant's conviction is affirmed.
The district court is directed to inform the defendant of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and file written proof that the defendant received the notice in the record of the proceedings. This case is remanded and the district court is ordered to amend the commitment and minute entry of the sentence to reflect that the defendant is given credit for time served. State v. Moore, 93-1632 (La.App. 3 Cir. 5/4/94), 640 So.2d 561.
AFFIRMED.